UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| RAUCH INDUSTRIES, INC., <br><br>Plaintiff, <br><br>vs. <br><br>CHRISTOPHER RADKO, a/k/a <br>CHRISTOPHER RADKOWSKI, a/k/a <br>KRZYSZTOF RADKOWSKI <br>and NORTHSTAR Sp. z.o.o., <br><br>Defendants. | Case No. 3:07-cv-197-C |

**MEMORANDUM AND ORDER**

Plaintiff Rauch presently is seeking injunctive relief to halt what it believes is an unlawful attempt to drive it out of business by Defendants Radko, formerly a member of its Board and Head of Rauch's Christopher Radko Division, and Northstar Sp., z.o.o., the primary manufacturer of Rauch's line of Christopher Radko ornaments. Specifically, Rauch is seeking three types of relief: that this Court (1) enforce the non-compete covenant contained in Mr. Radko's Employment Agreement not only against him but against Northstar on the grounds that Mr. Radko has de facto complete control over the company; (2) order Northstar to fill Rauch's orders certain Christmas ornaments, hand over the product samples, molds, etc. for Rauch's ornaments, and return Ruach's misappropriated customer list; and (3) enjoin Northstar from misleading and unauthorized use of Rauch's trademarks and from selling "knock-off" "Radko Style" ornaments.

The facts offered by the parties in this case are not in dispute. For the following reasons, the Court grants Rauch's motion except as to its requests that (a) Mr. Radko's non-compete obligations be enforced against Norther and (b) Northstar return Ruach's product samples, molds, etc.

1

# I. ANALYSIS

**A. Jurisdiction**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1)-(3). It has personal jurisdiction over Mr. Radko pursuant to the North Carolina long-arm statute. N.C.G.S. § 1-75.4(8). The Court likewise has personal jurisdiction over Northstar pursuant to the North Carolina long-arm statute, N.C.G.S. § 1-75.4(1)(D), as well as jurisdiction to enjoin Northstar, R.M.S.Titanic, Inc. v. Haver, 171 F.3d 943, 957 (4th Cir. 1999).

**B. Applicable Law**

The Court will apply North Carolina state law, including its choice-of-law rules, as to the parties' state law claims. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). As the Court finds that North Carolina is the state with the most significant relationship to the claims in this case, it therefore will apply North Carolina law to any putative contractual arrangement between Northstar and Rauch. Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988). The Court likewise will apply North Carolina law with regard to Rauch's veil piercing and related claims. See, e.g., Copley Triangle Assoc., Inc. v. Apparel Am., Inc., 385 S.E.2d 201, 203 (N.C. App. 1989). Finally, pursuant to their terms, the Employment, Intangible Assets and Stock Purchase Agreements at issue are governed by North Carolina substantive law. Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980); Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 599-600 (4th Cir. 2004).

The Court applies federal standards when considering a request for a preliminary injunction. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991).

C.      **Standard of Review**

The Court uses the analytical framework described in <u>Blackwelder Furniture Co. v. Seilig Manufacturing. Co.</u>, 550 F.2d 189 (4th Cir. 1977) and <u>Direx Israel</u>, 952 F.2d 802 to determine whether the situation warrants injunctive relief. First, the moving party must make a "clear showing" that it will suffer "irreparable harm" if the Court denies its request. <u>Direx</u>, 952 F.2d at 812-13. Second, if the moving party establishes irreparable harm, the Court balances the degree of irreparable harm to the moving party from the improper denial of interim relief against the degree of harm to the non-moving party from the improper grant of such relief. <u>Id.</u> at 812; <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 285 (4th Cir. 2000). Third, if the balance of likely harm tips decidedly in favor of the moving party, "a preliminary injunction will be granted if the moving party has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." <u>Id.</u> at 813. If, however, the balance does not tip so sharply, the moving party's probability of success assumes real significance, and interim relief shall be granted only upon a clear showing of a likelihood of success on the merits. <u>Id</u>. Finally, the Court must evaluate whether the public interest favors granting injunctive relief. <u>Id</u>.

D.      **Analysis of Likely Harms**

   1.    **Rauch has demonstrated a likelihood of irreparable harm**.

Rauch asserts that the principle injuries that have been and will be caused by Northstar's failure to fill Rauch's orders on time are that its customers will have the right to cancel its orders, the effect of which would be that Rauch could default on its loan agreements. <u>See</u> (Ruach's Motion

3

at pp. 4-5, 17-10). The Court finds that these injuries – the likely loss of a unique product and customer goodwill, and Rauch's possible bankruptcy – are harms for which any award at the end of trial would not adequately cure.[1]

Second, the Court likewise finds that given Mr. Radko's unique relationship to Rauch, and the Christopher Radko Division and its products, Rauch similarly has demonstrated that Radko's alleged breach of the non-compete agreement is likely to cause irreparable harm.[2]

Finally, the Court finds that Rauch has spent substantial amounts of time, money and resources in maintaining the reputation and quality of its trademark and trade dress. See (Chaplin Declaration at ¶¶ 6, 8, 27; Herndon Decl. at ¶¶ 6, 8, 24-28). In particular, any alleged misuse of its trade dress would encourage other companies to infringe with similar "knock-off" products and could disparage the reputation of genuine Christopher Radko ornaments as they become intertwined in the consumer's mind with cheaper imitations. See, e.g., Telebrands Direct Response Corp. v. Ovation Comms., Inc., 802 F. Supp. 1169, 1178 (D. N.J. 1992); Tri-Tech Inc. v. Eng. Dynamics, No. 88-0883, 1998 WL 273447 (D. Mass. 1988); Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456 (Fed. Cir. 1988) ("[I]n the absence of the injunction, other potential infringers will be encouraged to infringe.").

---

[1] See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."); Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975) ("[R]espondents alleged . . . that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."); see generally Roland Mach. Co. v. Dresser Indust, 749 F.2d 380, 386 (7th Cir. 1984) (listing situations where a damage remedy may be inadequate).

[2] See, e.g., Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 70 (2d Cir. 1999) (holding that if the "unique services" of the defendant are available to a competitor, "the employer obviously suffers irreparable harm"); Shred-It USA, Inc. V. Mobile Data Shred, Inc., 202 F. Supp. 2d 228 (principal owner's violation of non-compete clause in connection with its sale of assets to providers would be difficult to quantify); UBS Paine Webber, Inc. v. Aiken, 197 F. Supp. 2d 436, 441 (W.D.N.C. 2002) (irreparable harm likely where former manager breached non-compete agreement and solicited its customers).

### 2. The balance of harms allows for injunctive relief.

The Court's primary concern with requiring Northstar to fill Rauch's orders is that wrongly granting injunctive relief would create from whole cloth a contractual relationship between the two parties. The Court, however, finds that any delivery ordered by the Court ultimately would serve the interests of both Northstar and Rauch – Rauch would receive ornaments that its customers have already ordered, and Northstar would receive payment for ornaments it has already produced and can supply only to Rauch. See (Rauch Response at 17). The Court thus finds that the balance of harms tips sharply in favor of Rauch.[3]

With regard to enforcing the non-compete provision, the Court finds that because (1) Mr. Radko was fired, rather than resigned, and (2) Rauch requests, essentially, that Mr. Radko stop practicing his long-time business (the making and selling of holiday ornaments) within the United States and Canada, the likely harms stand balanced. Therefore, before the Court will grant such relief, Rauch must show a strong probability of success on the merits of its claims against Mr. Radko. Similarly, because Rauch is seeking to enjoin Northstar, who is a non-signatory to the Agreement in this case, Rauch must demonstrate a strong probability of success on the merits of its reverse veil-piercing claims before the Court will grant such relief.

Finally, the Court finds that enjoining the defendants from sending the same or similar solicitation letters to Rauch's customers, or using Rauch's trademarks in a similar fashion, is unlikely to cause the defendants substantial injury, and thus the balance of harms tips in Rauch's favor. See, e.g., Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 903 (7th Cir. 2001) (no harm where

---

[3] The Court notes that both Rauch and Northstar allege that any harm suffered by the other would be self-inflicted. See (Rauch's Reply at p. 2: "[t]his argument doesn't demonstrate that harm would result from the injunction – it demonstrates the harm that Northstar has caused itself by refusing to ship those products in the first place.") and (Northstar's Surreply at p. 3: "any harm suffered by Rauch arises from its repeated material breaches of contracts between Rauch and Arkadia."). Not only do such arguments beg the question, but the Fourth Circuit has expressly held that courts should not give less weight to a party's likely harm because such harm is allegedly "self-inflicted." Scotts Co. v. United Indus. Corp., 315 F.3d at 284.

5

defendant knew of plaintiff's trademarks before risking infringement). With regard to Rauch's trade dress claims, however, it appears that Rauch seeks to enjoin an entire product line, which certainly would cause considerable hardship to Northstar. As such, the harms stand balanced as to those claims.

**E.     Rauch's Showing on its Claims**

   **1.     Rauch has not shown a strong likelihood of success on its veil piercing claim.**

In a traditional veil-piercing case, an individual seeks to hold the individual shareholder responsible for the obligations of the corporation. See, e.g., Perpetual Real Estate Servs. v. Michaelson Props., 974 F.2d 545, 548-49 (4th Cir. 1992). In North Carolina, the courts allow the veil to be pierced and extend liability for corporate obligations "beyond the confines of a corporation's separate entity whenever necessary to prevent fraud or to achieve equity." Glenn v. Wagner, 329 S.E.2d 326, 330 (N.C. 1985). The benchmark is whether the corporation is a "mere instrumentality or alter ego of the sole or dominate shareholder and a shield for his activities . . . ." Henderson v. Security Mort. & Fin. Co., 160 S.E.2d 39, 44 (N.C. 1968).[4] In such instances, the separate identities of parent and subsidiary or affiliated corporations may be disregarded.

"Outsider reverse veil-piercing" extends this traditional veil-piercing doctrine to permit a third-party to pierce the veil to impose the obligation of an individual on the corporation. Such actions have gradually gained acceptance throughout the country. See C.F. Trust, Inc. v. First Flight Ltd. P'ship., 306 F.3d 126, 135 (4th Cir. 2002) (collecting cases). Indeed, the Court of Appeals of

---

[4] Specifically, North Carolina courts require a party seeking to pierce a corporate veil to show: (1) "control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; (2) that control "must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights"; and (3) "the aforesaid control and breach of duty must [have] proximately cause[d] the injury or unjust loss complained of." B-W Acceptance Corp., 149 S.E.2d 570, 576 (N.C. 1966). Accordingly, by this second requirement, North Carolina, unlike some jurisdictions, mandates proof of fraud or a legal "wrong" as a requisite for recovery.

North Carolina has explicitly recognized the reverse piercing of action. Strategic Outsourcing, Inc. v. Stacks, 625 S.E.2d 800, 805 (N.C. App., 2006). In Strategic Outsourcing, the court held that the plaintiff had established a *prima facie case* for veil-piercing under Glenn, and thus allowed the plaintiff to reverse pierce the corporate veil to establish jurisdiction over the corporation of which the individual defendant was the sole shareholder.

The Fourth Circuit has assumed without discussion that it is a viable action under North Carolina law. McLesky v. Davis Boat Works, Inc., 225 F.3d 654, 2000 WL 1008793 (4th Cir. 2000) (unpublished table decision). In McLeskey, the court held that, under Glenn, the plaintiff was entitled to pursue theories of piercing the veil of his corporate employer to reach its only shareholder and reverse veil-piercing to reach assets of other another corporation solely-owned by the same shareholder. Thus, this Court finds it likely that, like many courts, the North Carolina Supreme Court would find the rationale for traditional piercing operates with equal force in support of reverse piercing.

What remains in doubt, however, is whether the North Carolina Supreme Court would extend the doctrine to allow reverse veil-piercing beyond the particular facts of Strategic Outsourcing and McLeskey. In both cases, uncontroverted were the allegations that the non-corporate defendants had committed the legal wrongs at issue and were the sole shareholders of separate corporations that were the subject of the reverse piercing claims. While neither case limited itself to the specific facts, neither stands for the proposition that reverse piercing of the corporate veil is available in order to bind a corporation – which was not party to any non-compete agreement – to an individual agreement signed by a non-shareholder who is the "de facto" controller of corporation. Furthermore, even if a North Carolina court permitted reverse veil-piercing on the facts alleged by Rauch, that court might require proof that no innocent third party, such as a third-party creditor or shareholder,

7

would suffer harm or prejudice as a consequence of reverse veil-piercing. See C.F. Trust, Inc., 306. F.3d at 138 (collecting cases in which a plaintiff also must prove that no innocent third party, such as a third-party creditor or shareholder, would suffer harm or prejudice as a consequence of reverse veil-piercing).

Given the brevity and generality of the discussion in the cases approving reverse veil-piercing claims under North Carolina law, the Court finds that Rauch has not made a clear showing of a likelihood of success on the merits. Thus, to the extent that Rauch seeks to impose the obligations of Mr. Radko on Northstar (specifically, those relating to the non-compete provision), that relief will be denied. See Direx, 952 F.2d at 813 ("To doubt is to deny . . . if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.").

2. **Rauch claims regarding Mr. Radko's employment and asset transfer agreements.**

   a. *Rauch has demonstrated that the covenant at issue is valid and unenforceable.*

In North Carolina, a non-compete covenant is valid and enforceable if it is (1) in writing, (2) based upon valuable consideration, (3) reasonably necessary for the protection of legitimate business interests, (4) reasonable as to time and territory, and (5) not otherwise against public policy. Kennedy v. Kennedy, 584 S.E.2d 328, 333 (N.C. Ct. App. 2003) (citing A.E.P. Indus., Inc. v. McClure, 302 S.E.2d 754 (N.C. 1983)). Covenants not-to-compete restrain trade and therefore are strictly scrutinized. United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 382-83 (N.C. 1988). In this case, it is clear that the execution of Mr. Radko's non-competition agreement was a condition of Rauch purchasing his business and that he has been paid the additional compensation in accordance with the amended version of that agreement. See (Supplemental Chapin Decl. at ¶2).

With regard to the final two elements, post-employment restrictive covenants are subjected to special judicial scrutiny by the North Carolina courts; and such covenants whose time and territory restrictions are as lengthy and broad as the one before this Court have not faired well in North Carolina.[5] The Employment Agreement in this case, however, is more akin to a covenant given by the seller in connection with the sale of a business, and therefore is afforded greater latitude. Seaboard Indus., Inc. v. Blair, 178 S.E.2d 781, 787 (N.C. App. 1971) ("Among reasons often given for the greater acceptability of 'sale of business covenants' are that covenants not to compete enable the seller of a business to sell his goodwill and thereby receive a higher price; and they also furnish a material inducement to the purchaser who purchases a business with the hope of retaining its customers."); see Jewel Box Stores Corp. v. Morrow, 158 S.E.2d 840, 843 (N.C. 1969) (goodwill is "not marketable 'unless the owner is at liberty to sell his right of competition to the full extent of the field from which he derives his profit, and for a reasonable length of time' " (citation omitted)).

Here, the Court finds that Rauch sufficiently demonstrated that its business extends over the restricted territory, and given the unique relationship between Mr. Radko and Rauch, its ornaments,

---

[5] See Amer. Hot Rod Assoc., Inc. v. Carrier, 500 F.2d 1269, 1279 (4th Cir. 1974) (finding that because the covenant that implicitly covers "the world" is drawn broader than necessary for the protection of the plaintiff, it is therefore unreasonable); Comfort Spring Corp. v. Burroughs, 9 S.E.2d 473, 475-76 (N.C. 1940) (limitation in covenant restraining a former employee from selling for five years any product similar to those marketed by the employer "within the entire United States" was excessive); Hartman v. W.H. Odell & Assocs., Inc., 450 S.E.2d 912 (N.C. App. 1994) (setting forth six-part "reasonableness" test and finding unreasonable a five-year non-competition agreement that extended beyond the defendant's business operations and was not tied to the defendant's customers); Elec. South, Inc., v. Lewis, 385 S.E.2d 352 (N.C. App. 1989) (rejecting two-year world-wide non-competition restriction because it failed to focus on legitimate goal of preventing employee's competition for employer's customers in a relevant territory); Market Amer., Inc. v. Christman-Orth, 143, 520 S.E.2d 570 (N.C. App. 1999) (restrictions that former employee could not work for any company "using a similar matrix marketing structure or handling similar products to that of Market America" for a period of six months after termination was not unreasonable); Farr Assocs., Inc., v. Baskin, 530 S.E.2d 878 (N.C. App. 2000) (rejecting five-year agreement where prohibition extended to all clients in most of the U.S. and four countries, regardless of client's location or employee's prior contact with them); Dunbar Ins. Agency, Inc. v. Barber, 556 S.E.2d 331 (N.C. App. 2001) (approving two-year agreement prohibiting employee from soliciting any customers, irrespective of prior contact).

9

and Northstar, the restrictions are necessary for the protection of Rauch's legitimate business interests and are not "unreasonable and oppressive" upon Mr. Radko or otherwise against public policy. Therefore, the Court will enjoin Mr. Radko from violating the non-compete provisions of his employment agreement.

        b.    *Northstar may be prohibited from acting in active concert with Mr. Radko.*

A non-competition agreement generally cannot be enforced against a non-signatory to the agreement. N.C.G.S. Gen. Stat. § 75-4 (1999). Section 11 of the Agreement at-issue, however, specifically prohibits Mr. Radko from offering product to Northstar or compete against Rauch on his own or in conjunction with others. Federal Rule of Civil Procedure 65(d) authorizes injunctions that are binding on "persons who are in active concert or participation" with a party and receive notice of the injunction. See, e.g., Little v. Associated Technical Training Servs., Inc., 12 F.3d 205, 1993 WL 498282 (4th Cir. 1993) (unpublished table decision) (citing Schmidt v. Lessard, 414 U.S. 473, 476-77 (1974)); Sineath v. Katzis, 12 S.E.2d 671, 681 (N.C. 1941) ("stranger to the covenant" that knowingly aids violation of non-compete "may well be enjoined from . . . conducting a business in competition with the covenantee"). Thus, the Court will enjoin Northstar from acting in concert or participation with Mr. Radko, as provided for in Section 11 of the Employment Agreement.

**3.    Rauch has demonstrated that Northstar should ship the orders.**

Beyond satisfying the elements described in Blackwelder, a party seeking a mandatory preliminary injunction must first demonstrate that the relief is necessary not just to preserve the status quo, but to protect the requesting party against irreparably worsening conditions caused by the defendant. Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)).

Here, the Court finds that Rauch has met its initial burden of showing that, at the time that the allegedly unlawful acts complained of reasonably may be believed to have occurred, the status quo between the parties was Northstar shipping ornaments to Rauch.

The gist of Rauch's request for mandatory injunctive relief is that the course of dealing between the parties has established a contract for the goods in question. See N.C.G.S. 25-2-204(1) ("[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."); see, e.g., Gainey v. PGA/Creative Corporate Staffing, 2003 WL 1877847, at *5 (N.C. Ct. App. Apr. 15, 2003); Adhesives Co. v. Funder Am., Inc., 366 S.E.2d 505, 507-08 (N.C. App. 1988).

Here, Rauch alleges that each of the 400 shipments from Northstar to Rauch have "followed the same pattern or course of dealing": Rauch would send an e-mail with an attached excel spreadsheet specifying the items, description, quantity, and the date the order should leave the factory and the date the order must arrive in North Carolina; Northstar would then confirm receipt of that order, manufacture the products requested, and ship the product to Rauch; and finally Northstar would invoice Rauch through Arkadia.

The Court finds that this course of dealing between the parties indicates that they intended to contract and that a contract was formed. Although Northstar argues that the parties "never agreed on any pricing for individual orders and, thus, no binding contract was created between the two parties," the price of each order was established by Northstar's agent Arkadia before any order was placed by Rauch. The Court similarly is not convinced that the Interim Production Agreement invalidates the prior course of dealing since the IPA's integration clause applied only to "the matters it covers," i.e., the particular ornament shipments agreed to therein.

Thus, the Court finds that Rauch has demonstrated a sufficient likelihood that it and Northstar have a contract for the goods in question and therefore the mandatory injunctive relief that it seeks – the delivery of Christmas ornaments by Northstar (by the date specified on the order and summarized in Attachment B to the Paiva Declaration) – is warranted under the circumstances.

4. **Request for production samples, molds, castings and sculpts and Rauch's customer list.**

Rauch has requested the models, sculpts, production samples or other physical replicas that Northstar made from its designs. Given that this is a mandatory injunction, the heightened standard applies. Here, the Court has ordered Northstar to fill its 2007 Christmas season orders, and has prohibited Northstar from infringing upon Rauch's trade dress. Therefore, the Court finds that Rauch no longer demonstrates an immediate likelihood of irreparable harm. As such, its request for the samples, etc. will be denied.

Rauch also alleges that Mr. Radko gave Northstar a list of Rauch's 50 biggest customers. The Court finds doing so would violate the non-compete provision and amount to misappropriation of trade secretes. Therefore, to the extent that either defendant has such a list, the Court will require that party to return that list.

5. **Rauch's trademark and trade dress claims.**

    a. *The Court will enjoin further use of the solicitation letter and like acts of infringement.*

Rauch alleged that Northstar used without authorization its registered "Christopher Radko" trademarks in the solicitation sent to Rauch's customers on August 15, 2007. Specifically, the e-mail subject line stated: "Rauch supplier of Christopher Radko Glass Ornaments Announcement." The e-mail annexed an advertisement that prominently features the "Christopher Radko" trademark.

To show trademark infringement, Rauch must prove: (1) that it owns a registered trademark; and (2) that Northstar used the mark without authorization in commerce, in a manner likely to create consumer confusion. 15 U.S.C. § 1114(l)(a); Superformance Int'l Inc. v. Hartford Cas. Ins. Co., 332 F.3d 215, 220 (4th Cir. 2003); Microsoft Corp. v. Computer Serv. & Repair, Inc., 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004).

Here, Rauch owns incontestable trademark registrations for the trademarks "Christopher Radko" (U.S. Reg. Nos. 2002475, 2002476, and 2005720), and "Radko" (U.S. Reg. No. 2006196). Under 15 U.S.C. § 1115(b), an incontestable registration is "conclusive evidence of the validity of the registered mark and [. . .] of the registrant's exclusive right to use the registered mark in commerce." Rauch has invested considerable sums of money in maintaining, developing and promoting the goodwill symbolized by the "Christopher Radko" trademarks.

The Court finds that Northstar's unauthorized use of the registered "Christopher Radko" trademarks in the Northstar solicitation is likely to – and did in fact – create confusion as to whether Rauch was the source or sponsor of the letter. The subject heading did not use Northstar's name, but instead used Rauch's mark "Rauch" together with Rauch's registered "Christopher Radko" trademark in order to capture the attention and initial interest of Rauch's customers for Christopher Radko Christmas ornaments. A number of courts have found that such initial interest confusion is actionable as trademark infringement.[6] Furthermore, the solicitation letter's use of "Christopher Radko" was not merely a descriptive use of another's trademark, see, e.g., Am. Angus Ass'n v.

---

[6] See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331 (2d Cir. 1975), Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987); Dr. Seuss Enterprises. v. Penguin Books USA, Inc., 109 F.3d 1394, 1404 (9th Cir. 1997), Asia Apparel LLC v. Ripswear, Inc., No. 02-469, 2004 WL 3259009 at *4 (W.D.N.C. 2004); see generally J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:6 (4th ed. 1997) (collecting cases).

13

Sysco Corp., 829 F. Supp. 807, 827 (W.D.N.C. 1993), but is confusing to, and in fact confused, Rauch's customers.

Northstar therefore will be enjoined from such unauthorized and misleading use of Rauch's trademarks.

      b.    *Trade dress claims.*

"Trade dress" refers to the total image or overall impression created by a product or its packaging, which performs the same source identification function as a trademark. Trade dress includes two general types: (1) packaging (e.g., the shape of a Coca Cola bottle), and (2) product design or configuration (e.g., the "pink" color of Owens Corning's fiberglass insulation).

To establish a claim of trade dress infringement, the plaintiff bears the burden of showing that: (1) it owns protectable rights in and to the trade dress, including that the trade dress (a) is inherently distinctive or has acquired "secondary meaning" and (b) is not functional; (2) it began use of its trade dress prior to the defendant's use of its similar trade dress, and (3) the defendant's use of its trade dress is likely to cause confusion. Ashley Furniture Indus. v. Sangiacomo N.A., 187 F.3d 363, 368 (4th Cir. 1999).

In this case, the specific inquiry is whether or not Rauch has established that its "Radko Style" ornaments have achieved a recognizable and distinctive place in the relevant marketplace, i.e. they have taken on a "secondary meaning." Secondary meaning occurs when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000).

It is readily apparent that the "Radko Style" ornaments – "a non-functional combination of specific, recognizable features: a finely detailed and painted sculptural glass ornament, with detailed

and well-articulated human or animal figures" – have a special and distinctive niche in the world of Christmas ornaments showing an inherently distinctive trade dress. The defendants do not dispute that the Radko Style ornaments have achieved a celebrated status within the industry and have received prominent national and international attention. And the plaintiff has offered evidence of the amount and manner of its advertising, together with sales volume and massive consumer interest. See (Herndon Decl., at 24.); Perini Const., 915 F.2d 121, 125 (4th Cir. 1990).[7]

This secondary meaning is further bolstered by evidence of intentional copying. While the defendants have not admitted intentional copying (compare with Osem Food Indus. Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 163, 165 (4th Cir. 1990)), the record is clear that Northstar copied Rauch's trade dress with the intent to confuse Rauch's customers: the stark similarity of the available 2007 ornaments from Northstar and Rauch; the fact that Northstar manufactures both sets of ornaments; and Northstar's misleading solicitation letter to Rauch's customers advertising "Radko Style" ornaments from the "the same talented European craftsmen," sent at the time it decided to not ship Rauch's ornaments, which clearly was designed to lure Rauch's customers to its products. Such evidence of direct and intentional copying of another's brand equity gives rise to a presumption of secondary meaning.[8]

---

[7] Courts have found secondary meaning on the basis of far less evidence that presented by Rauch. See DanaBraun, Inc. v. SML Sport Ltd., No. 00-6405, 2003 WL 22832265, *2 (S.D.N.Y. 2003) (concluding that plaintiff's catalog had acquired secondary meaning solely on the bases that it is distributed to 10,000 retailers three to four times a year and evidence that defendants intentionally copied the trade dress); Direct Mktg. of Virginia, Inc. v. E. Mishan & Sons, Inc., 753 F. Supp. 100, 105-06 (S.D.N.Y. 1990) (granting plaintiff's motion for a preliminary injunction and concluding that the trade dress of plaintiff's watch had acquired secondary meaning based on $5 million in advertising, $20 million in gross sales, and evidence of intentional copying).

[8] See Int'l Bancorp, LLC v. Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco, 329 F.3d 359, 371 (4th Cir. 2003); Osem Food Indus. Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 163, 165 (4th Cir. 1990); Shakespeare Co. v. Silstar Corp. of Am., Inc., 110 F.3d 234, 240-241 (4th Cir. 1997) (holding that the presumption exists where the newcomer's intent is to "free-ride," i.e., to get the consumer to believe that the new product "is either the same, or originates from the same source as the product whose trade dress was copied"); Taylor Corp. v. Four Seasons Greetings, LLC., 315 F.3d 1039, 1043 (8th Cir. 2003) (finding circumstantial evidence where, *inter alia*, the artists who created greeting cards for one company were the same artists who created the allegedly infringing designs for another company).

The Court therefore finds that Rauch has demonstrated a sufficient likelihood of success on the merits and will enjoin Northstar and Radko from use of Rauch's trade dress.

F.  **The Public Interest Favors an injunction in this case**

"While the law frowns upon unreasonable restrictions, the public interest does favor[] the enforcement of contracts intended to protect legitimate interests . . . . It is as much a matter of public concern to see that valid contracts are observed as it is to frustrate oppressive ones." Beam v. Rutledge, 9 S.E.2d 476, 477 (N.C. 1940). Furthermore, "the law 'implies in every contract a covenant that neither party will do anything that will deprive the other of the fruits of his bargain." Bicycle Transit Auth., Inc. v. Bell, 333 S.E.2d 299, 305 (N.C. 1985) (citation omitted).

Moreover, the public has an interest in preventing the misappropriation of the skills, creative energies, and resources that are invested in the protected works, especially where the plaintiff has shown a clear likelihood of success on certain claims.

Thus the public interest favors granting the injunction in this case.

G.  **Bond**

The purpose of the bond is to provide security for any damages resulting from an improvidently granted injunction. Fed. R. Civ. Pro. 65(c).

With regard to its request that Northstar fill its orders (summarized in Attachment B to the Pavia Declaration), the Court finds that a bond in the amount of the total price of the products in the shipment requested by Rauch, plus the costs of shipping is appropriate.

With regard to its request that Northstar be enjoined from infringing upon Rauch's trade dress, the Court finds that a bond in the amount of $10,000 U.S. is appropriate.

Finally, with regard to its injunction enjoining Mr. Radko from violating the non-compete provisions in his Employment Agreement, the Court finds that, pursuant to Section 12 of the Agreement, no bond is required.

## II. CONCLUSION

For the foregoing reasons, the Court finds that Rauch has met its burden under <u>Blackwelder</u> and its progeny with regard to some of its claims. **THEREFORE, IT IS HEREBY ORDERED THAT** Defendants Radko, Northstar, their respective officers, employees, agents, representatives and all persons in active concert or participation with them who receive actual notice of this Order shall cease and desist from taking the proscribed actions as follows:

1. Defendant Radko shall immediately cease and desist from all business competition with the plaintiff, including but not limited to the designing, manufacturing, importing, marketing, selling, and distributing of Christmas ornaments and related products in the United States and Canada;

2. Defendant Radko shall cease and desist from all efforts to induce or attempt to induce any customer or any manufacturer, to withdraw, curtail or cancel its business with Rauch;

3. Defendants Radko and Northstar shall immediately cease and desist from using any "Christopher Radko" trademark and from making any false or misleading statements relating to plaintiff or its products;

4. Defendants Radko and Northstar shall immediately cease and desist from selling or advertising ornaments identical or substantially similar to the "Christopher Radko" style ornaments;

5. Defendants Radko and Northstar shall immediately cease and desist from using any list(s) of Rauch's customers in their possession and shall return them to Rauch.

Signed: October 25, 2007

*Robert J. Conrad, Jr.*
Robert J. Conrad, Jr.
Chief United States District Judge